# In the United States Court of Federal Claims

FLIGHTSAFETY DEFENSE
CORPORATION,

*Plaintiffs,*

v.

THE UNITED STATES,

*Defendant.*

Nos. 20-95C and 21-1725C
(Filed November 18, 2024)

Phillip R. Seckman, Dentons US, LLP, Denver, CO, for plaintiffs.

Stephanie A. Fleming, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**
**Granting the Government's Motion for Summary Judgment and**
**Denying FlightSafety's Cross-Motion for Summary Judgment**

**SILFEN,** *Judge.*

The U.S. Air Force solicited offers to develop a crew training system for a new aircraft that Boeing was developing. The Air Force awarded FlightSafety the contract to develop the crew training system over a fifteen-year period while Boeing continued to develop the aircraft. Delays in the aircraft development delayed FlightSafety's crew-training-system development. FlightSafety asked the Air Force contracting officer for its additional expenses caused by the delays. The contracting officer denied FlightSafety's requests, and FlightSafety sued in this court under the Contract Disputes Act, 41 U.S.C. § 7104. The court consolidated FlightSafety's claims.[1]

---

[1] This opinion was originally issued under seal. The parties had no proposed redactions. The court reissues the opinion publicly.

The government moves for summary judgment. FlightSafety opposes and moves for partial summary judgment, arguing that it is entitled to its expenses; the summary judgment it seeks is only partial because the extent of damages remains to be determined. According to FlightSafety, the Air Force deliberately withheld material information about Boeing's delays during the solicitation process, causing FlightSafety to underestimate its risks and expenses in bidding for the contract. FlightSafety also argues that the Air Force has not met its contractual obligations because it has not provided FlightSafety with the data it needs to develop the crew training system.

FlightSafety bid on a fixed-price contract. It therefore bore the risks of unexpected events, including delays in Boeing's ongoing development of the aircraft. FlightSafety agreed to bear the burden of obtaining the aircraft data either from the government or through agreements with Boeing. And, in fact, FlightSafety recognized that development delays were possible when it submitted an offer and provided ways to address those delays. The government did not withhold material information about the possible delays during the solicitation process. Thus, this court **grants** the government's motion for summary judgment and **denies** FlightSafety's motion for partial summary judgment.

## I.    Background

In 2006, the Air Force began discussions to develop and build a new aircraft that could refuel other airplanes mid-flight. Stipulation at 1-3 [¶¶1-4] (joint stipulation of facts filed under seal at ECF No. 37; public redacted version available at ECF No. 42); JA2; JA36-42 (joint appendix filed under seal at ECF No. 57; public redacted version available at ECF No. 58). The Air Force split the development of the new aircraft among three contracts: a contract for the aircraft, a contract for the crew training system, and a contract for a maintenance training system. Stipulation at 1 [¶2]; JA2. The Air Force chose to use separate contracts for the aircraft and the two training systems to save costs and preserve a competitive environment. *Id*.

2

The Air Force was aware of the challenges of using separate contractors for the aircraft and the training systems. Contractors would need to work together, with the aircraft manufacturer giving its data to the training systems contractors under separate agreements that the separate contractors would negotiate. Stipulation at 3-5 [¶¶5-7], 9 [¶15]; JA43-48. In an earlier contract, structured similarly, FlightSafety was the training systems contractor and had a hard time getting data from the aircraft manufacturer, leading to significant delays and cost overruns. Stipulation at 4-5 [¶7], 9 [¶15]; JA46-48. Here, the Air Force nevertheless chose to bifurcate the aircraft development and training systems contracts. Stipulation at 19 [¶30]; JA643. The Air Force required the systems contractors to obtain necessary data from the aircraft developer through agreements among the contractors. *Id*.

In early 2010, the Air Force held a workshop with prospective crew training system contractors and discussed the risks of bidding on the contract. Stipulation at 19 [¶31]. One risk the Air Force identified in the workshop was that timely or quality data might not be available when needed. Stipulation at 19-20 [¶32]. The Air Force identified that risk as "highly likely" to occur and projected a most-likely six-month delay, or at worst a twelve-month delay. Stipulation at 24-25 [¶¶39-40]. Later, the Air Force held a question-and-answer session and told all prospective crew training system contractors that their proposals should include contingencies for mitigating the risks of delayed data. Stipulation at 26-28 [¶44] (questions and answers 76, 127); JA2629; JA2680.

The Air Force awarded Boeing the contract to manufacture the aircraft in early 2011. Stipulation at 30 [¶47]; JA200-69. Boeing's proposed aircraft was a modified version of the commercial Boeing 767 airplane. Stipulation at 30-31 [¶45]. The contract between the Air Force and Boeing stated that Boeing would supply the Air Force with data packages and that Boeing would also

enter into an associate contractor agreement with the crew training system contractor. Stipulation at 30 [¶48], 32-34 [¶¶55-58]; JA263; JA1861; JA1918; JA14201. The Boeing contract included five delivery dates for Boeing to transfer specific data to the Air Force. Stipulation at 36-38 [¶¶66, 68].

In April 2012, the Air Force approved a crew training system management plan. The plan stated that the Air Force would pass any of Boeing's data that the Air Force received on to the crew training system contractor. Stipulation at 68-69 [¶115]. The next month, Boeing sent a draft of the first simulator data to the Air Force. Stipulation at 78 [¶132]; JA5459. Shortly after receiving the data, an Air Force contractor in charge of reviewing the data told the Air Force that the data was deficient. Stipulation at 80 [¶137]; JA5523. Later, the Air Force conducted an audit of the Boeing data. Stipulation at 85 [¶148].

While the Air Force was reviewing Boeing's initial data, FlightSafety began discussions with Boeing to come to an agreement to "expedite discussions post-award," should FlightSafety win the crew training system contract. Stipulation at 81 [¶140]; JA5531. Boeing responded to FlightSafety that Boeing "intend[ed] to enter good faith negotiations to establish an Associate Contractor Agreement … with the Air Force's selected Tanker [crew training system] contractor," but Boeing warned FlightSafety that Boeing's contract with the Air Force did not obligate Boeing to send data directly to the training system contractor, and any technical support provided would be subject to fees and separate contracts. Stipulation at 83-84 [¶145]; JA5560.

In May 2012, FlightSafety submitted an initial proposal to the Air Force for the crew training system contract. Stipulation at 86 [¶149]; JA5564. FlightSafety included an evaluation of risks. Stipulation at 89-91 [¶155]. FlightSafety identified "[d]elays or changes in aircraft development [that] impact [the crew training system] program schedule" as an "occasional" risk that was

"[a]cceptable with significant reduction in margin." Stipulation at 90 [¶155]. FlightSafety took responsibility to mitigate the risk of those delays. *Id.* (identifying FlightSafety representatives as "Responsible Parties" for "Delays or changes in aircraft development [that] impact [crew training system] program schedule"). FlightSafety also explained that it would "obtain Aircraft Design Criteria Data directly from the aircraft Original Equipment Manufacturers …, principally Boeing, via Associate Contractor Agreements." Stipulation at 92-93 [¶158]; JA5786-87. FlightSafety noted that "[t]he most likely issues will be data availability and timeliness of receiving such data and the ease [with] which configuration changes can be accommodated." Stipulation at 95 [¶162]; JA5792.

FlightSafety's proposal stated that its engineering process could address problems with insufficient data: "As data deficiencies are discovered, FlightSafety will establish work around[s] to minimize the impact. As an example, certain areas of development can be moved further down the schedule while accelerating others. This will allow more time to locate the missing data." Stipulation at 94-95 [¶161]; JA5790. FlightSafety further explained that, if data was insufficient, "[a]lternate data sources can be used from similar systems allowing for the initial development to begin and as the specific [aircraft] data becomes available, changes can be incorporated. Some data gaps may be mitigated with the use of new sources of models from air vehicle and air vehicle component manufactures, the scientific literature (including NASA reports), FlightSafety's extensive modeling background, and from flight observations and comparable flight tests." *Id.*

Along with its proposal, FlightSafety's CEO included a letter stating, "FlightSafety takes no exception to any of the solicitation requirements. We are offering to perform this contract for a very low rate of return and strongly desire to be your supplier in this very strategically important program. You have my personal commitment that we will deliver the required goods and services for the prices set forth in our proposal." Stipulation at 105 [¶182]; JA6382.

After the Air Force received initial systems contractor proposals, including FlightSafety's, Boeing notified the Air Force that it would not provide the Air Force with commercial Boeing 767 supplier data because Boeing lacked the rights to that data. Stipulation at 107-08 [¶190]. Boeing told the Air Force that some of the supplier data, or the best alternative for that data, would not be part of the initial data delivery as originally expected but instead would be part of later deliveries in October 2013 and June 2016. *Id*. In internal discussions, the Air Force understood that Boeing's timeline might meet the Air Force's expectations but would impact the crew training system contractor. An Air Force employee stated,

> October 2013 might be 'liv[e]able' for the Government, if we waive the delivery date requirements for the [crew training system] and declare inability to support the [initial testing and evaluation] schedule. Expect the winning [crew training system] Contractor to file a claim if it takes until Oct 2013 to get the design data …. June 2016 is a non-starter. Impossible to deliver the [crew training system] under those conditions.

Stipulation at 108-09 [¶191]; JA6533-34. The Air Force did not notify the potential contractors that some of Boeing's data, originally scheduled for July 2012, would not be available until October 2013 or later.

In December 2012, FlightSafety submitted its updated proposal. Stipulation at 111 [¶196]; JA9074. FlightSafety submitted the lowest bid, which was substantially lower than its closest competitor. Stipulation at 112 [¶199-200]; JA9078; JA9084. The contract selection committee recommended awarding the contract to FlightSafety because FlightSafety offered the best value to the Air Force, and all offerors had similar technical evaluations. Stipulation at 112 [¶201]; JA9079. In its proposal, FlightSafety again agreed that it would "obtain Aircraft Design Criteria Data directly from the aircraft Original Equipment Manufacturer …, principally Boeing, via Associate Contractor Agreements." JA9315-16.

In May 2013, the Air Force awarded the crew training system contract to FlightSafety. The contract states,

> The contractor shall obtain all design criteria necessary to comply with the requirements of the contract. The contractor shall enter into contractual agreements with other contractors, as necessary, to obtain all data required. The contractor shall execute a sublicense agreement with the Government for the use and protection of aircraft design data …. Design criteria … shall consist of, but is not limited to, the following types of data and information: technical reports, test reports, technical manuals …, engineering drawings, schematics, wiring diagrams, memoranda of telephone conversations and meeting minutes.

Stipulation at 118-19 [¶221]; JA9170.

During the post-award conference between FlightSafety and the Air Force, FlightSafety gave the Air Force an intended schedule. Under that schedule, FlightSafety gave a so-called "need date" of June 14, 2013, for the commercial data package, and a need date of October 1, 2013, for the aircraft data package. Stipulation at 125 [¶237]; JA9818; JA9826; JA15177-87. In June 2013, FlightSafety sent Boeing a proposed associate contractor agreement, which included a list of data that FlightSafety needed from Boeing. Stipulation at 125-28 [¶239]. Boeing responded that FlightSafety's proposed agreement put obligations on Boeing that Boeing's aircraft contract did not require. Boeing sent back its own associate contractor agreement that did not include a list of data Boeing would provide. Stipulation at 129 [¶241]; JA9919. Boeing and FlightSafety hit an impasse. In late July 2013, FlightSafety briefed the Air Force on the impasse and notified the Air Force of the impact the negotiations would have on the schedule. Stipulation at 135-136 [¶¶255-57]; JA9968-69.

In August 2013, the Air Force gave FlightSafety the 2012 Boeing draft simulation data. Stipulation at 138-39 [¶260]; JA9985-86. FlightSafety reviewed the data, found it deficient, and notified the Air Force of the deficiencies. Stipulation at 139-41 [¶263]; JA9998-99. Several weeks later, the Air Force told FlightSafety that it had provided a draft, not the complete data the Air

Force had received from Boeing. Stipulation at 149 [¶273]; JA10011-12. The Air Force then sent FlightSafety the full dataset that it had received from Boeing. Stipulation at 150 [¶275]; JA10028-29. In October 2013, FlightSafety and Boeing executed the associate contractor agreement. Stipulation at 160 [¶296]; JA10150-55. Recognizing that the data had deficiencies, the Air Force elected to not accept it until January 2015, a year and a half after the data was originally scheduled to be delivered. Stipulation at 158 ,177 [¶¶298, 335]; JA10146; JA11221. According to FlightSafety, when the Air Force accepted that dataset from Boeing it was still deficient and missing key data. Stipulation at 176-78 [¶¶334-37]; JA11221.

Under the contract, the Air Force began exercising production options for the flight simulators in August 2015, requiring FlightSafety to begin manufacturing the simulators. Stipulation at 115 [¶213]. Due to the delays in obtaining the data from Boeing, FlightSafety incurred additional costs as it began manufacturing the simulators. Stipulation at 187 [¶337]. Boeing's data continued to be delayed while FlightSafety manufactured the simulators. *See* Stipulation at 265-66, 269 [¶¶451-52, 454, 466]; JA13283-92; JA13295; JA13538-39. Boeing delivered an updated data set in October 2019, three years after the estimated delivery date; according to FlightSafety that dataset was also deficient. Stipulation at 265 [¶451], 274-75 [¶475]; JA13283-88; JA13646.

FlightSafety submitted a first set of claims to the contracting officer, seeking compensation for its expenses based on the government's not delivering the complete data and FlightSafety's having to still meet the contract schedule. ECF No. 24 at 4 [¶5], 39-48 [¶¶218-283] (complaint). The contracting officer issued a final decision denying those claims two months later. *Id*. at 4 [¶¶6-7]. FlightSafety timely appealed the contracting officer's decision to this court. *Id*. at 4 [¶8]. Later, FlightSafety submitted a second set of claims to the contracting officer, seeking compensation for further delays, on the same theories. *Id*. at 4 [¶9], 48-59 [¶¶284-357]. The contracting officer did

not issue a final decision on the second set of claims within the 60-day statutory period to issue an opinion. *Id.* at 4-5 [¶¶10-12]; *see* 41 U.S.C. § 7103(f)(5). FlightSafety timely appealed the contracting officer's constructive denial to this court. *Id.* at 5 [¶13]. The court consolidated the two cases. ECF No. 23.

The parties now cross-move for summary judgment on all claims of the consolidated complaint. The court held a hearing on the pending motions.

## II.    Discussion

The government moves for summary judgment, arguing that (1) in entering into a fixed-price contract, FlightSafety bore the risk of unexpected costs; (2) the contract expressly allocated to FlightSafety the risks of contracting with the aircraft manufacturer to obtain necessary data; and (3) the Air Force did not breach the contract under any of FlightSafety's contract theories. *See* ECF No. 38. FlightSafety opposes and requests summary judgment in its favor. ECF No. 40. FlightSafety seeks $41.5 million in damages, although it is not seeking a damage calculation on summary judgment.

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with exclusive jurisdiction to decide specific types of monetary claims against the United States. *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994); 28 U.S.C. § 1491(a)(1). The Contract Disputes Act, Pub. L. No. 95-563, 92 Stat. 2383 (1978), amends the Tucker Act and provides the court with "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 ... on which a decision of the contracting officer has been issued under [the Contract Disputes Act]." 28 U.S.C. § 1491(a)(2).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rules of the Court of Federal Claims, Rule 56(a). Disputes over material facts preclude summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could "affect the outcome of the suit under the governing law." *Id.* A dispute is genuine when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.* "The party seeking summary judgment has the initial burden of establishing that there is not genuine dispute as to any material fact." *8x8, Inc. v. United States*, 854 F.3d 1376, 1380 (Fed. Cir. 2017).

When deciding a motion for summary judgment, a court must "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment should be granted when the record "could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 599 (1986) (quotation marks omitted). "When both parties move for summary judgment, grant of the motion in favor of one party must satisfy this rule concerning factual inferences; cross-motions do not change the requirement that all justifiable inferences must be drawn in favor of the losing party." *Murphy Exploration & Production Co. v. Oryx Energy Co.*, 101 F.3d 670, 673 (Fed. Cir. 1996). On cross-motions for summary judgment, "each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." *Marriott International Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009).

A. **FlightSafety's contract with the Air Force did not require the Air Force to deliver more data than it had to FlightSafety, and FlightSafety assumed the risk of Boeing's delays**

FlightSafety alleges that its contract with the Air Force obligated the Air Force to timely deliver the simulator data package to FlightSafety and that the Air Force, in failing to do that, cost FlightSafety money. FlightSafety argues that the Air Force's failure is both a constructive change to the contract (ECF No. 24 at 40 [¶ 222] (count I), 50 [¶294] (count VII)) and a breach of the contract (*id*. at 41 [¶231] (count II), 51 [¶304] (count VIII)). The government responds that, because the contract was a fixed-price contract that expressly placed the burden to get the necessary

data on FlightSafety, the government is entitled to summary judgment on its responsibility to de-liver data.

To succeed on a claim for a breach of contract, a party must prove "1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). For a claim for a constructive change, a contractor must show "(1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *Bell / Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014).

For both types of claims, FlightSafety must prove that the Air Force was contractually required to deliver the simulator data package to FlightSafety, such that FlightSafety would be performing work beyond the contract requirements if it had to get the data some other way. But the crew training system contract between FlightSafety and the Air Force requires FlightSafety to take its own steps to obtain any necessary data from Boeing, which was developing the aircraft. And while the Air Force agreed to provide data it had, no part of the contract requires the Air Force to go get it if the Air Force did not already have it.

FlightSafety argues first that the terms of the contract are ambiguous. While the contract requires FlightSafety to "obtain" the data, FlightSafety argues that the term "obtain" did not require FlightSafety to generate missing or delayed data. ECF No. 40 at 26. FlightSafety argues that it understood "obtain" to mean that it would receive the information from Boeing or the government, and not that it had to affirmatively acquire or develop the information. *Id*. FlightSafety points to one dictionary, incorporated into the contract, which defines "obtained" as "received and docu-mented." JA14933. FlightSafety adds that one clause of the contract states that it would need to

11

"execute a sublicense agreement with the Government for the use and protection of aircraft design data" (Stipulation at 118-19 [¶221]), implying that the government would provide the data.

When read as a whole, the record overwhelmingly shows that the crew training system contractor, FlightSafety, was responsible for working with the aircraft manufacturer, Boeing, to take steps to get the necessary data. The Air Force made that clear before the solicitation and in the contract, and FlightSafety made clear in its offer that it planned to get the data directly from Boeing and understood the risks that Boeing might not provide the data promptly.

Before the solicitation, the Air Force put prospective offerors on notice that they would need to proactively work with the aircraft contractor (ultimately Boeing) to get the data. The Air Force stated in 2009 that the "selected [crew training system] contractor will be required to enter into an Associate Contractor Agreement with the … tanker aircraft prime contractor … in order to obtain data and associated license rights necessary to develop, field, operate, and sustain" the crew training system. Stipulation at 19 [¶30]. Later, in a pre-solicitation conference, the Air Force repeated that expectation. Stipulation at 58 [¶100] (January 2012 conference slide stating, "Concurrency / Data—[crew training system] Contractor *must* work with aircraft [manufacturer]"); JA4771.

The Air Force's pre-solicitation answers to questions reinforced the same point; the Air Force explained that proposals needed to include ways to mitigate the risk that data might not be available or accurate when the contractor needed it. Stipulation at 26 [¶44] (answer to question 76); *see id*. at 28 [¶44] (answer to question 118 stating that offerors would enter into contracts with third parties to obtain the aircraft data and that offerors may have to pay license fees, and answer

to question 127 stating that the Air Force "expects proactive effort by the [crew training system] contractor will be needed").[2]

FlightSafety points out one question and answer where a potential offeror asked, "[w]ill data in the package … be GFP [Government Furnished Property]?" and the government answered, "Yes." Stipulation at 27 [¶44] (question 97). But the weight of the pre-solicitation evidence supports the government's interpretation that while the Air Force always intended to provide whatever data it had, it also intended for the contractor to go get any additional data it needed from the aircraft manufacturer.

FlightSafety argues that the questions and answers are part of the solicitation. ECF No. 51 at 5-6. The questions and answers that FlightSafety relies on were issued before the final solicitation. *Compare* Stipulation at 62-63 [¶108], 69-70 [¶116] *with* Stipulation at 71 [¶119]. Only questions and answers incorporated into the final solicitation become part of the solicitation. *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016). Here, the solicitation did not incorporate the pre-solicitation questions and answers; they are extrinsic to the solicitation and to FlightSafety's contract. *See TEG-Paradigm Environmental, Inc. v. United States*, 465 F.3d 1329, 1341 (Fed. Cir. 2006).

---

[2] In its brief, FlightSafety quotes the first part of the Air Force's response to question 127, which states, "Government expects data to be delivered per aircraft contract." ECF No. 40 at 29 (quoting Stipulation at 27 [¶44]). FlightSafety's brief omits the next and only additional sentence of the answer that states that the government expected offerors to work proactively to acquire the data, replacing that part of the answer with an ellipsis. That omitted half of the answer is clearly material to the issue before the court. Although the court will not impose any penalty this time, counsel for FlightSafety is reminded of the duty of candor toward the court; misrepresentations, even through omission, may result in sanctions in the future. *See Precision Specialty Metals, Inc. v. United States*, 315 F. 3d 1346, 1357 (Fed. Cir. 2003).

The contract itself states, "The contractor shall obtain all design criteria necessary to comply with the requirements of the contract. The contractor shall enter into contractual agreements with other contractors, as necessary, to obtain all data required." Stipulation at 118-19 [¶221]; JA9170. The contract supersedes all pre-solicitation evidence. *See Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) ("If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; [a court] may not resort to extrinsic evidence to interpret them."); s*ee generally Harvey v. United States*, 8 Ct. Cl. 501, 506 (1872) ("[T]he written contract is the last and most deliberate act of the parties ... therefore all the preliminary papers passing between the parties while the contract was *in fieri*, are ... inadmissible to contradict or vary the written agreement."). Thus, even if the questions and answers raised ambiguity, the clear terms of the contract control.

Although the contract also required FlightSafety to "execute a sublicense agreement with the Government for the use and protection of aircraft design data" (Stipulation at 118-19 [¶221]), implying that the government would provide the data, that comports with the government's view of the contract. The government agreed to provide FlightSafety with any data it had; it just did not agree to provide FlightSafety with the rest of the data FlightSafety might need that the government did not have.

FlightSafety was aware of its contractual obligation to affirmatively get Boeing's data. In its integrated master plan, FlightSafety stated that it would "obtain Aircraft Design Criteria Data directly from the aircraft Original Equipment Manufacturers …, principally Boeing, via Associate Contractor Agreements …, but may include any number of … aircraft suppliers, such as Woodward, Inc. for the boom, and Cobham for the wing pods and centerline drogue." JA9315.

FlightSafety's plan also included a flowchart showing that Boeing would provide the data directly to FlightSafety via associate contractor agreements, and not through the Air Force.



**Figure 3.4-1  Design Criteria Data Management during EMD**

JA9316.

FlightSafety was aware of the risks of concurrently developing a flight simulator alongside the aircraft. On a previous project, FlightSafety was the training systems contractor and had a hard time getting data from the aircraft manufacturer, and FlightSafety had to work through those issues. Stipulation at 4-5 [¶7], 9 [¶15], 103-04 [¶179]; JA46-48. Here FlightSafety included plans to work through similar issues. *E.g.*, Stipulation at 105 [¶181]. In its proposal, FlightSafety stated that "[a]s data deficiencies are discovered, FlightSafety will establish work around[s] to minimize the impact." Stipulation at 94-95 [¶161]; JA5790. FlightSafety added that in the case of missing data,

> Alternate data sources can be used from similar systems allowing for the initial development to begin and as the specific [aircraft] data becomes available, changes can be incorporated. Some data gaps may be mitigated with the use of new sources of models from air vehicle and air vehicle component manufactures, the scientific

> literature (including NASA reports), FlightSafety's extensive modeling back-
> ground, and from flight observations and comparable flight tests.

*Id*. It is notable that FlightSafety agreed to use "alternate data sources" because, in its complaint,

FlightSafety specifically complains that it had to use "sophisticated and costly alternative data

development methods" to replace missing data. ECF No. 24 at 32 [¶164].

FlightSafety's proposal further noted that "[t]he most likely issues will be data availability

and timeliness of receiving such data." Stipulation at 95 [¶162]. FlightSafety was aware that it was

bidding on a concurrent development, that there was a risk of "insufficient or missing data," and

that it would need to proactively mitigate that risk. *Id*. at 97 [¶166]; *id*. at 100 [¶175] (FlightSafety

identified "'obtaining and managing aircraft design data' as a key area of risk and presented an

approach to managing and mitigating that risk as required by the terms of the Solicitation."); *id*. at

134 [¶250] (FlightSafety engineer stating that "[w]e carried exactly this item [obtaining data from

Boeing through an associate contractor agreement] as the highest risk during our proposal and

since").

FlightSafety argues that the government's interpretation of the contract requires

FlightSafety to get data from Boeing and potentially pay for it, but that would effectively require

the government to pay Boeing twice for developing the aircraft: once when paying Boeing directly

and a second time when paying more for the training system contract that incorporates the cost of

FlightSafety's paying Boeing for the data. ECF No. 40 at 35. The government has broad discretion

in making contract award decisions, even if the contract it awards contains some cost inefficien-

cies. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials

have substantial discretion to determine which proposal represents the best value for the govern-

ment."). And if entering into that contract avoided a burden of being a middleman, the government

might have preferred that. That is especially true here, where FlightSafety's offer was significantly

16

less expensive than any other offer, even incorporating the potential cost of paying twice for Boeing's data.

Furthermore, it is undisputed that the contract is a fixed-price contract. Fixed-price contracts shift the risk of the cost of performance of the contract to the contractor. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996); *Lakeshore Engineering Services., Inc. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014) ("The essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs."). That shifting of risk means the contractor must account for unforeseen difficulties or delays. *See United States v. Spearin*, 248 U.S. 132, 136 (1918); *ITT Arctic Servs., Inc. v. United States*, 524 F.2d 680, 691 (Ct. Cl. 1975); *Day v. United States*, 245 U.S. 159, 161 (1917) ("[W]hen the scope of the undertaking is fixed, that is merely another way of saying that the contractor takes the risk of the obstacles to that extent."). Thus, in addition to explicitly telling potential offerors that they needed risk strategies in case of data delays, the contract format itself shifted the risk of delays to FlightSafety.

Finally, FlightSafety's definition of the word "obtained" as "received and documented" does not overcome the weight of the record that FlightSafety bore the burden of getting the data from Boeing and bore the risk of delays in that process.

Contract terms are given their plain meaning and interpreted in a manner that best supports all provisions in the contract. *McAbee Construction Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). Here, the integrated master plan includes a definition for the past participle "obtained," not the present tense "obtain." JA14933. The integrated master plan relies on the "Action Term Dictionary" to define "common verbs used in the [integrated master plan] document." JA9284. That dictionary defines "obtained" as "received and documented." JA14933. But the past participle indicates a completed action. *E.g.*, *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*,

554 U.S. 33, 39 (2008). When something has been obtained, it is irrelevant how the obtaining was done. For the present tense verb "obtain," on the other hand, the contract statement of work states, "The contractor shall obtain all design criteria necessary to comply with the requirements of the contract," and "[t]he contractor shall enter into contractual agreements … to obtain all data required." Stipulation at 118-19 [¶221]. Instead of passive receiving and documenting, the contract requires active effort by the contractor to obtain the data, consistent with the plain meaning of the term.

If the plain language of the contract is ambiguous, the court looks to extrinsic evidence "to derive a construction that effectuates the parties' intent at the time they executed the contract." *TEG-Paradigm Environmental*, 465 F.3d at 1338. The extrinsic evidence also supports the court's understanding of the verb "obtain." Internal FlightSafety documents show that FlightSafety understood that it had an affirmative obligation to get the data from Boeing. *See* JA13298 ("They can assign blame to us regarding data shortages based on [the requirement to 'obtain all design criteria']."); *id.* ("Yep, seen that one before. Pretty clear statement we never should have accepted."); JA9936 ("We carried exactly this item [obtaining data from Boeing through an associate contractor agreement] as the highest risk during our proposal and since. Let's just move forward as we do and mitigate it. As part of the risk mitigation we need to provide our work-arounds including going forward with public domain for previously obtained design criteria data.").

And, as already discussed, in pre-solicitation discussions, the Air Force explained that offerors would need to work proactively with Boeing to obtain the data. Stipulation at 19 [¶30], 58 [¶100]; JA4771. As also discussed, in its proposal, FlightSafety understood that it would need to work with Boeing to ensure that it had the necessary data and would likely need to make up for missing data. *E.g.*, Stipulation at 94-95 [¶¶161-162], 97 [¶166]. Even if the contract term "obtain"

were ambiguous, the parties both understood that the contract required FlightSafety to proactively get the data either from Boeing or other sources.

FlightSafety does not allege that the Air Force withheld data that it had; it only alleges that the Air Force was required to get and provide more data. The contract and record demonstrate that FlightSafety knowingly entered into a fixed-price contract that included significant risks of data delay. FlightSafety was aware of those risks, and it explained that it was prepared to take them on. While the delays ended up being more significant and expensive than FlightSafety anticipated, the burden to get the data remained on FlightSafety. To the extent that FlightSafety contracted with Boeing to promptly get the data, FlightSafety might have a remedy against Boeing for delays, but FlightSafety does not have a remedy against the Air Force. The Air Force did not breach or constructively change the contract by failing to provide FlightSafety with data it did not have.

**B.    FlightSafety's remaining theories for recovery are also foreclosed by the terms of the contract**

FlightSafety argues that even if the court determines that the Air Force was not obligated to provide the simulator data, FlightSafety is still owed compensation because the Air Force acted improperly. FlightSafety alleges that the Air Force (1) breached an implied warranty; (2) withheld superior knowledge about Boeing's delays, leading FlightSafety into a ruinous course of action; (3) required FlightSafety to perform a commercially impracticable contract; and (4) violated the implied covenant of good faith and fair dealing. FlightSafety's theories are all foreclosed by the terms of the contract.

**1.    There was no implied warranty requiring the Air Force to deliver aircraft data to FlightSafety**

FlightSafety alleges that the Air Force breached an implied warranty when it failed to supply data after the "Air Force warranted that the data necessary to perform the Contract would be timely made available to FlightSafety." ECF No. 24 at 42 [¶235] (count III), 52 [¶309] (count IX).

FlightSafety argues that, even if the Air Force did not have to provide data, the Air Force promised that Boeing would deliver it, amounting to an implied warranty. ECF No. 40 at 46-48.

"[T]o recover for a breach of warranty, a plaintiff must allege and prove [that (1)] a valid warranty existed, (2) the warranty was breached, and (3) plaintiff's damages were caused by the breach." *Hercules Inc. v. United States*, 24 F.3d 188, 197 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996). An implied-in-fact warranty also requires a plaintiff to show a "meeting of minds." *Agredano v. United States*, 595 F.3d 1278, 1281 (Fed. Cir. 2010). A party can show a meeting of the minds when "the circumstances strongly support[ ] a factual inference that a warranty was implied." *Lopez v. A.C. & S., Inc.*, 858 F.2d 712, 715 (Fed. Cir. 1988).

FlightSafety argues that several questions and answers from the pre-solicitation meetings told offerors that the simulation data package would be available at the beginning of the simulation development phase. ECF No. 40 at 46-48. According to FlightSafety, Boeing still had not delivered some of that data as of the time of the summary judgment briefing or at the time of the oral argument. *Id*. at 47; ECF No. 63 (Hearing Transcript) at 54:9-19 ("[O]n July 5th [2024], FlightSafety was sent a letter by the United States regarding [Boeing's data delivery c]," which explained that the government was accepting the data but noted that the dataset was likely still incomplete, and the government expected FlightSafety to work around any missing data.)

FlightSafety has not demonstrated that a meeting of the minds took place, explicit or implied, that the data would be available promptly. As already discussed, the questions and answers clearly stated that the Air Force was not responsible for providing any data it did not already have. Stipulation at 26-28 [¶44]. In those answers, the Air Force made clear that offerors would need to include risk mitigation for obtaining the data from Boeing (question 76), that offerors would need to enter into contracts with third parties to obtain the aircraft data and might have to pay licensing

fees (question 118), and that the Air Force "expects proactive effort by the [crew training system] contractor will be needed" to obtain the relevant data from the aircraft manufacturer (question 127). *Id*. Those answers demonstrate that the Air Force expected the contractor to actively work to get the data from Boeing, and that their proposals should account for the risk that the data would be delayed or inaccurate.

### 2.    The Air Force did not fail to provide superior knowledge

FlightSafety alleges that the Air Force had a "duty to know and understand both the quality and the reasonable availability of the aircraft data required for performance of the Contract and to timely disclose such knowledge to FlightSafety." ECF No. 24 at 44-45 [¶251] (count IV), 55 [¶324] (count X). FlightSafety argues that the Air Force withheld key information about Boeing from offerors, which resulted in FlightSafety's underestimating the risks of delay in its proposal. ECF No. 40 at 40-43. But FlightSafety had the relevant information.

The superior knowledge doctrine "imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000). In fixed-price contracts, the superior knowledge doctrine provides a narrow exception to the general rule that the contractor assumes the risk of increased performance costs. *P&K Contracting, Inc. v. United States*, 108 Fed. Cl. 380, 394 (2012), *aff'd*, 534 F. App'x 1000 (Fed. Cir. 2013). The contractor must prove four elements: that "(1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012) (quoting *Hercules*, 24 F.3d at 196).

FlightSafety has not established that the Air Force withheld superior knowledge. While it may be true that the Air Force did not disclose significant delays in earlier projects, FlightSafety was the contractor that experienced those delays. ECF No. 40 at 41; Stipulation at 4-6 [¶¶7-8]. The Air Force did not have superior knowledge of those delays. The Air Force likewise did not withhold the terms of Boeing's contract. In fact, the Air Force gave the offerors a copy of Boeing's contract so the offerors could validate the representations the Air Force made. JA13063 n.222.

FlightSafety also argues that the Air Force withheld information regarding the progress of Boeing's contract, including that Boeing's initial data deliveries were not compliant with its contract and that Boeing would be delayed in meeting future data deadlines. ECF No. 40 at 41-42. FlightSafety had enough information to at least ask about the status of Boeing's data deliveries. The Air Force put the offerors on notice that they would need to work with Boeing to get the data; the offerors had the terms of Boeing's contract; FlightSafety had its past experience as a guide; and FlightSafety was already in communication with Boeing to discuss terms of an eventual associate contractor agreement. Stipulation at 81, 83-84 [¶¶140, 145]. Thus, FlightSafety had the reason and the means to request more information from Boeing or the Air Force about Boeing's expected timeline. *See Scott Timber*, 692 F.3d at 1373 (requiring, for a superior knowledge claim, that the plaintiff "had no reason to obtain such information"); *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1357 (Fed. Cir. 2007) (rejecting the plaintiff's superior knowledge claim and finding that when the plaintiff entered into a concurrent contract, it was aware of the risks and had reasonable opportunities to seek updates regarding the status of the concurrent contract).

### 3.    FlightSafety's performance of the contract was not commercially impracticable

FlightSafety alleges that the "[t]he lack of required data for performance of the Contract rendered timely performance of the Contract commercially impracticable as awarded, and the

Government is responsible for the cost impacts of the delay." ECF No. 24 at 46 [¶269] (count V), 57 [¶342] (count XI). FlightSafety argues that, even if it bore the risk of obtaining the data, Boeing's delays made FlightSafety's contract commercially impracticable. ECF No. 40 at 43.

A contract is commercially impracticable "when performance would cause 'extreme and unreasonable difficulty, expense, injury, or loss to one of the parties,'" or when "'all means of performance are commercially senseless.'" *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 261 cmt. D (1981)). "A finding of impracticability excuses a party from performing unless the party has assumed the risk of the event." *Id.*; *see Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002).

As already discussed, FlightSafety assumed the risk of delays in obtaining the simulator data from Boeing. FlightSafety argues that because the data did not exist, FlightSafety was being forced to bear a different risk, one that it could not have anticipated and that the contract did not contemplate: It was being asked to create the data on its own. ECF No. 40 at 45-46.

FlightSafety's proposal undermines its distinction between obtaining and creating the data. In its proposal, FlightSafety noted that "as data deficiencies are discovered, FlightSafety will establish work around[s] to minimize the impact," and added that for missing data, "[a]lternate data sources can be used from similar systems allowing for the initial development to begin and as the specific [aircraft] data becomes available, changes can be incorporated." Stipulation at 94-95 [¶161]. Indeed, it proposed using "new sources of models" from other manufacturers, the scientific literature, "FlightSafety's extensive modeling background, and from flight observations and comparable flight tests." *Id.* FlightSafety's own statements thus demonstrate that it was aware that data might not be available, especially at the beginning of the contract. Furthermore, as the government points out, the contract contained no directive for FlightSafety to develop its own data, and

FlightSafety was able to get extensions from the Air Force when it did not have the data. ECF No. 49 at 12-13 n.9, 16 n.11; Stipulation at 239-40 [¶¶401-02].

Because FlightSafety took on the risk of delays from Boeing and understood that those delays might require obtaining data from sources other than Boeing or the government, FlightSafety has not demonstrated that the contract was commercially impracticable.

### 4.    The Air Force did not violate the covenant of good faith and fair dealing by not enforcing its contract with Boeing

FlightSafety alleges that the covenant of good faith and fair dealing obligated the Air Force to enforce its contract with Boeing, which the Air Force failed to do. ECF No. 24 at 48 [¶281] (count VI), 58-59 [¶355] (count XII); ECF No. 40 at 36-40.

The duty of good faith and fair dealing is an inherent covenant present in all contracts. Restatement (Second) of Contracts § 205. It requires a party "to not interfere with another party's rights under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1, 828 (Fed. Cir. 2010). A claim for a breach of the covenant of good faith and fair dealing is "limited to assuring compliance with the express terms of the contract and can not be extended to create obligations not contemplated in the contract." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 1106 (2020) (cleaned up). Proof requires a specific promise that is undermined by the government's actions. *See Metcalf Construction Co. v. United States*, 742 F.3d 984, 991-92 (Fed. Cir. 2014). Typically, circumstances where the government has been held to violate the covenant involve a "bait-and-switch," where the government promises a benefit or contractual provision and then rescinds that promise. *See Precision Pine*, 596 F.3d at 829.

FlightSafety argues that Boeing's contract with the Air Force required Boeing to timely deliver data to the training systems contractor, which it failed to do. ECF No. 40 at 37-38. FlightSafety also notes that Boeing's contract required it to contract with the training systems

contractor, but Boeing initially refused to enter into that contract and caused further delays while the parties negotiated terms. *Id*. at 38-40. According to FlightSafety, it raised those issues with the Air Force, but the Air Force refused to enforce its contract with Boeing because the Air Force "made a strategic decision that it would rather engage in a dispute with FlightSafety than Boeing." *Id*. at 39.

FlightSafety's arguments rely on an overbroad interpretation of the covenant of good faith and fair dealing and understate the Air Force's actions. FlightSafety had an obligation to work directly with Boeing to obtain the data. Stipulation at 77-78 [¶131] (listing topics, including "expedit[ing] the acquisition of required data," that the agreement between the training systems contractor and Boeing needed to address). FlightSafety understood and planned for that, as already discussed.

Even if FlightSafety is correct that the Air Force had a responsibility to assist FlightSafety in obtaining the data, the record demonstrates that the Air Force assisted throughout the performance of the contract. When FlightSafety brought its concerns to the Air Force, the Air Force contacted Boeing and tried to move along the data collection and delivery. *See* Stipulation at 235-39 [¶400] (Air Force internal communications discussing pushing Boeing to supply data to FlightSafety); *id*. at 240-46 [¶¶405-14] (discussing establishing a joint Air Force-Boeing-FlightSafety team to determine what data FlightSafety needed and how to provide it). When Boeing submitted non-compliant data, the Air Force pushed back. Stipulation at 223-26 [¶¶382, 385] (Air Force reminding Boeing that it did not think the delivery was complete). The Air Force did not resolve all of FlightSafety's challenges, but it did offer to help FlightSafety execute the contract. That was not a bait-and-switch or an example of the government otherwise undermining the

contract. *See Precision Pine*, 596 F.3d at 829; *Metcalf*, 742 F.3d at 991. FlightSafety has not shown that the Air Force's actions breached the covenant of good faith and fair dealing.

### III.    Conclusion

The government's motion for summary judgment is **granted**, and FlightSafety's motion for partial summary judgment is **denied**. The complaint is dismissed. The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

         s/ Molly R. Silfen
MOLLY R. SILFEN
Judge